UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

PERRY PICARAZZI,            §
                                  §
        Plaintiff,        §
VS.                          §     CIVIL ACTION NO. C-10-63
                                  §
JOHN CRANE, INC.,         §
                                  §
        Defendant.     §

## ORDER

On this day came on to be considered Defendant John Crane Inc.'s Motion for Summary Judgment.  (D.E. 25.)

For the reasons stated herein, Defendant's Motion for Summary Judgment is DENIED.

**I.**    **Jurisdiction**

The Court has federal question jurisdiction over this action, 28 U.S.C. § 1331, as it is brought under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA") and the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA").

**II.**    **Background**

    **A.**    **Factual Background**

Defendant John Crane, Inc. ("JCI") manufactures, sells and services engineered sealing systems for industrial markets.  JCI is headquartered in Morton Grove, Illinois and the branch office and service center, where Plaintiff Perry Picarazzi worked, is located in Corpus Christi, Texas.

JCI most recently hired Plaintiff on October 24, 2005. (D.E. 25, Ex. D, §IV). Plaintiff previously had worked for JCI between 1991 and 1996 as a Seal Repair person until he was laid off. (Ex. A at p. 26, ll.18-24; Ex. D at §IV). Plaintiff's job when he returned was Customer

Service Representative II. (Ex. D at §4; Ex. F). Plaintiff worked at JCI's Corpus Christi Branch throughout his employment. (Ex. D, §IV). Plaintiff was terminated on June 26, 2008. (Ex. C at p.141, ll.19-25; Ex. 17).

The record establishes that Plaintiff has a history of alcoholism, (D.E. 25, Ex. A, p. 46-52), and it is undisputed that Plaintiff's alcohol problems while employed at JCI led to a series of absences from work. (D.E. 25, Ex. A (Picarazzi Depo.)) According to Defendant, these absences led to points being accumulated against Plaintiff under the JCI Attendance Policy.

Under the Policy, an absence counts as two points. An employee is subject to discipline if 5 points are accumulated in any 30 day period, or 7 points are accumulated in any 90 day period, or 12 points are accumulated in any 365 day period. The first level of discipline is a Written Warning. The second level of discipline is a Final Warning. The third level of discipline is Discharge.[1]

The absence points were assessed by Plaintiff's supervisor Gary Kretschmar and JCI's Director of Human Resources Walter Burdorf.

Plaintiff disputes Defendant's characterization of events, contending that Defendant made these point assessments retroactively while Plaintiff was on approved FMLA leave; that Defendant's point assessments are inconsistent with Defendant's own story and policies; that Defendant never informed Plaintiff that he was accumulating absence points; and did not give Plaintiff warnings, as required by the Policy, until long after a duty arose to do so. (D.E. 27.)

The summary judgment evidence establishes the following series of events, leading up to Plaintiff's termination on June 26, 2008:

---

[1] According to JCI management, a Written Warning should be issued to the employee "[a]s soon as administratively possible," which means "[a]s soon as management can sit down with the employee to talk to him about it." (D.E. 27, Ex. 2 (Burdorf Depo.) at 83-84.) The Policy further provides that "[a]ll attendance records will be maintained by the immediate supervisor and available for review by the employee." (D.E. 25, Ex. E, p. 45.)

### 1.      Plaintiff's Absences Due to Alcohol Related Problems

During the months of January, February and March of 2008, Plaintiff was absent from work several times.  Plaintiff admits that at least some of these absences were due to drinking, and that he did not disclose his drinking to anyone at JCI at that time. (D.E. 25, Ex. A at p. 51, ll.4-19).

By around March 30, 2008, Plaintiff had apparently accumulated at least 7 unexcused absences within a 90 day period, triggering a discipline action under the Attendance Policy.  (Ex. E (Attendance Policy)).  Accordingly, Plaintiff's supervisor, Gary Kretschmar, drafted a Written Warning, the first level of discipline under the Policy.  (Ex. I (Written Warning)).

However, the Warning was not issued to Plaintiff at this time.  According to Kretschmar, he did not give the Written Warning to Plaintiff at that time because Plaintiff was absent from work. (Ex. B, p. 71, ll.2-24, p. 72, ll.1-11, p. 141, ll.2-25) (Q: "And is it your testimony that you had no opportunity whatsoever to get that information to Mr. Picarazzi?" A: "That is correct. Not until he returned.")  Kretschmar contends he did not want to have anyone else give Plaintiff the warning, as it was his responsibility.  (Ex. B, p. 71-72.)

Rather, the March 30, 2008 Written Warning was not issued to Plaintiff until June 20, 2008, six days prior to Plaintiff's termination on June 26, 2008, and the same day on which Plaintiff received his Final Warning.  (Ex. I (Written Warning); Ex CC (Final Warning).

### 2.      Plaintiff's FMLA Leave Of Absence At Watershed

Around late March or April 2008, Plaintiff called his supervisor Kretschmar (sometimes called "Skip") and told him about his alcohol problems. (Ex. A, p. 132, ll.13-22) ("That is the [period in which] I called Skip my boss, Gary, and told him what was going on…I said, "I need to get some help.")

On April 2, 2008, Plaintiff went to the Watershed Addiction Treatment Programs ("Watershed") for treatment, where he was first diagnosed with alcoholism. (Ex. A at p. 44, ll.16-23).  Plaintiff's health care provider at Watershed was Dr. Stephen Zella.  (Ex. J.)

To facilitate his stay at Watershed, Plaintiff completed Leave of Absence documentation and requested FMLA leave from JCI, commencing April 1, 2008. (Ex. J).  The "Certification of Health Care Provider," completed on April 4, 2008 by Dr. Zella, confirmed that Plaintiff was admitted to Watershed on April 2, 2008, and that Dr. Zella estimated discharge 28-30 days later on May 2, 2008. (Ex. J, p. 3-5).

On April 4, 2008, JCI acknowledged Plaintiff's notice of need for leave commencing April 1 and continuing to approximately May 4, 2008. (Ex. K).  JCI's Leave Administrator in Human Resources, Jan Tuton, stated that Plaintiff's "leave of absence [had] been approved as of April 1, 2008."  She stated that Plaintiff would have to update Human Resources every 30 days of his status, and that his job would be protected until the 12 week period of leave to which he was entitled under the FMLA expired on June 23, 2008.  (Id.)

On April 23, 2008, Plaintiff was discharged from Watershed. (Ex. A at p. 146, ll.19-22; Ex. L).  In a letter confirming Plaintiff's discharge and return-to-work date, Dr. Zella stated that Picarrazi had worked very hard at his recovery during his stay at Watershed and became a "positive example and role model for the community."  (Ex. L.)

Although Plaintiff claims that he felt physically fine enough to return to work as of his April 23, 2008 discharge date, (Ex. A, p. 155, ll.2-10), and admitted in his complaint that Watershed had released him to return to work on April 24, 2008,  (Ex. D, Section IV),  Dr. Zella stated in his letter that Plaintiff was referred to an Outpatient Program and that he could return to work with no restriction on April 30, 2008. (Ex. L.)

Plaintiff did not report to work on April 24, 25, 28 or 29, even though he was not in Watershed at that point. (Ex. A at p. 147, ll.19-25; p. 148, ll.1-9).

On April 29, 2008, Plaintiff told Kretschmar that he had relapsed and had decided to go back in to rehab. (Ex. A at p. 155, ll.13-25) ("I called Skip the night before I decided to go back in…I told Skip I relapsed, and he said, "I understand, it's part of the disease…Go back …take care of it and call me every day.")

Even though his release date was not until April 30, 2008, Plaintiff was assessed two attendance points for his absences between April 24 and April 29.  JCI's Director of Human Resources Walter Burdorf, who assessed the two points, contends that he assessed the two points against Plaintiff, even though Plaintiff was on approved leave, because Plaintiff "was discharged during that leave of absence.  It ended the leave of absence." (Ex. C, p. 104, ll.9-10).

Plaintiff returned to Watershed for a second term of rehab from April 30 to May 8, 2008. (Ex. N).  On May 8, 2008, Dr. Zella sent a letter confirming this stay and discharging Plaintiff to return to work on May 13, 2008.  (Id.)  Watershed scheduled an appointment for Plaintiff for outpatient therapy at Padre Behavioral Hospital ("Padre") on May 9, 2008. (Ex. N at 3.) However, Plaintiff did not go to Padre on May 9, 2008. (Ex. A at p. 165, ll.8-17).  Plaintiff claims he instead went to Coastal Bend, a different treatment facility, on May 9, 2008.  But Plaintiff apparently did not provide any documents to JCI showing that he went to Coastal Bend. (Ex. A at p. 168, ll.9-14; Ex. C at p. 112, ll.13-25).

### 3.      Plaintiff's Return to Work

Plaintiff returned to work on May 13, 2008.  (Ex. A at p. 172, ll.13-14; Ex. M). The May 13 return date was consistent with the return to work date provided by Dr. Zella.  (Ex. M.) Nonetheless, Plaintiff was assessed two points for the period between May 9 and May 12.

Burdorf, who assessed these points, admits that Plaintiff's return to work date was May 13, but states that he assessed the points because Plaintiff was "not under a healthcare provider" on those days.  (Ex. C. at p. 112, ll.13-25, p. 113, ll.1-3).  That is, he used the Watershed discharge date of May 8, 2008, rather than the return to work date of May 13, 2008, for computing Plaintiff's FMLA leave.

Plaintiff also reported to work on May 14, 2008.  (Ex. A, p. 180.)  However, Plaintiff called in sick for the following two days, May 15 and 16.  Plaintiff states that he believes these absences were due to a "blood pressure thing." (Ex. A at p. 183, ll.16-23).

### 4.    Plaintiff's Relapse

Plaintiff admits that he started consuming alcohol again between May 20 and May 23, testifying that he drank about a pint of vodka each day. (Ex. A at p. 187-188, ll.22-24).

Plaintiff received two attendance points for his absences between May 15 and May 21. (Ex. G ( "Perry Picarazzi Attendance" worksheet)).

On May 21, 2008, Plaintiff notified Kretschmar by email that he had "relapsed again." Plaintiff stated: "Do what you have to do. You have helped me more than you should have." (Ex. P).

On May 21, 2008, Kretschmar notified Leave Administrator Tuton that Plaintiff had relapsed and started drinking again.  (Ex. DD (Tuton decl.) at ¶ 4).  Tuton sent Plaintiff the application for his leave of absence and certification forms and told him, "[y]our health care provider is required to provide information on the 'Certification of Health Care Provider forms.'" (Ex. DD; Ex. Q, ¶4). Tuton also told Plaintiff, "[f]ailure to provide this documentation can result in benefits being suspended." (Id.)

Also on May 21, Kretschmar asked Plaintiff to come to a meeting at JCI's Corpus Christi office on May 22, 2008, to participate in a conference call "to discuss [his] future employment with [JCI]." (Ex. R; Ex. A at p. 188, ll.21-25). Plaintiff did not show up for the meeting. (Id. at p. 189, ll.14-17).

Plaintiff was absent from work between May 22 and May 29. (Ex. G ("Perry Picarazzi Attendance" worksheet)). Plaintiff concedes that for these absences, as well as all other absences between May 14 and June 1, he had not seen a health care provider, but instead sought local help though AA meetings and clergymen. (Ex. A at p. 216, ll.14-24; p. 217, ll.23-25)

On May 28, 2008 Plaintiff emailed Kretschmar, asking what his status was with JCI. (Ex. S). On May 29, Kretschmar told Plaintiff he was on a medical leave of absence and that Plaintiff and his medical care provider must complete the FMLA form and return it to Tuton within the allotted time frame. (Ex. T).

On May 30, 2008, Plaintiff advised Tuton by e-mail that he was ready to send in his certification forms, but that because his insurance was depleted he had sought "local help. These are my only providers." (Ex. U).

### 5.    Plaintiff's FMLA Leave Of Absence At Padre

On May 24, 2008, Plaintiff filled out another Request for Leave of Absence form, requesting a leave of absence from June 2 to June 30, 2008. (Ex. V at 1.)

On June 4, 2008, Gulf Side Medical Clinic faxed Jan Tuton the completed Request for Leave of Absence form.  The "Certification of Health are Provider" form was filled out by Dr. Giavanonne. It indicated that Plaintiff had been examined by Dr. Giavanonne at Gulfside Medical Clinic on June 4.  Dr. Giavanonne stated that Plaintiff needed another period to obtain

treatment and that Plaintiff would not be able to work from approximately June 2, 2008 to June 30, 2008.  (Ex. V at JCI 725-727).

Plaintiff admits in his deposition that Dr. Giavanonne just examined Plaintiff and referred him to Padre Behavioral Hospital; he did not treat Plaintiff for his alcohol problems or check him into a treatment facility.  (Ex. A at p. 203, ll.13-25, 204, ll.1-2.)  On the Leave of Absence Instructions page, Plaintiff indicated that there was no Certificate of Health Care Provider because he had "local help." (Ex. V at p. JCI 729; Ex. A at p. 201, ll.18-25, 202, ll.1-10).

Plaintiff did not work any days between June 2 and June 6, 2008. (Ex. A at p. 224, ll.22-25, 225, ll.1-3).  Plaintiff was assessed two points for his absences between June 2 and June 6. According to Burdorf, this was because Plaintiff was not in treatment or under a healthcare provider, and so JCI had nothing to cover his absence from June 2 to June 6. (Ex. C, p. 131, ll.7-22).

On June 9, 2008, Plaintiff checked into the Padre Behavioral Hospital for outpatient treatment.  (Ex. A. at 225).

On June 10, 2008, while Plaintiff was at Padre, Burdorf sent Plaintiff an e-mail and a letter explaining JCI needed more information to evaluate his May 24 Request for Medical Leave, and to determine if Plaintiff was entitled to FMLA leave. (Exhibits X & Y). Burdorf told Plaintiff he "must have his health care provider answer the questions on Attachment A, hereto, and provide us the written response, signed by the health care provider, by no later than June 17, 2008. If there is more than one health care provider who has examined and/or treated you, please have that provider complete the enclosed blank FMLA Medical Certification along with the extra copy of Attachment A that I have enclosed." (Ex. Y).

In his June 10 response to Burdorf's letter, Plaintiff stated that the period from May 14 to June 1 was the period during which he sought help from a qualified provider.  Realizing that his insurance was exhausted, he sought local help through AA meetings, his sponsor and his clergymen.  (Ex. Z at 2.)  He stated that he then talked to Jan Tuton, who "informed [him] that any medical doctor would work."  So he went to Gulfside and then checked into Padre.  (Id.)

Burdorf replied on June 13, 2008, stating:

Who is your healthcare provider and when? This is what we need to know.

If Dr. Giavanonne is your healthcare provider, then he needs to complete Attachment A in respect to the Leave of Absence Form dated May 24, 3008.

It appears that you have been receiving treatment through Padre Behavior.  This is another healthcare provider.  They need to complete the second FMLA form with Attachment A.

Please have these documents completed and returned to me no later than June 17, 2008.

 (Ex. Z, p. 1).

On June 13, Plaintiff had a telephone conversation with Kretschmar in which Plaintiff said he would return to work on June 16th.  Kretschmar apparently told him not to return until the 17th because he "wanted to make sure that Attachment A was at Jan Tuton's office" by the time Plaintiff returned.  (Ex. A at 225-226.)

Plaintiff also spoke with Burdorf, who reiterated that he needed Attachment A from Dr. Giavanonne and Attachment A from Padre.  (Id. at 226.)

There is some dispute as to when precisely Plaintiff received "Attachment A."  (D.E. 25, Ex. A at 219-221.)  However, at some point on June 13, 2008, Dr. Giavanonne faxed the "Attachment A" form to Burdorf, confirming that Giavanonne examined Plaintiff on June 4, 2008. (Ex. AA).

On June 15, 2008, Plaintiff was discharged from Padre.  (Ex. A at p. 225, ll.16-25, p. 226, ll.1-10).

Plaintiff returned to work on June 18, 2008. (Ex. A, p. 261, ll.13-23).[2]

That same day, Padre sent Tuton documentation of Plaintiff's treatment at Padre commencing June 9. (Ex. BB).  The "Certification of Healthcare Provider" form confirmed that Plaintiff was under treatment at Padre between June 9 and June 15. (Ex. A at p. 215, ll.3-9).

### 6.        Issuance of Warnings and Termination of Plaintiff

Around June 20, 2008, Kretschmar issued Plaintiff a Written Warning.[3]  On the same day, Plaintiff also received a Final Warning, dated June 18, 2008. (Ex. CC).  Both warnings are signed by Kretschmar and Picarazzi on June 20, 2008.  Both warnings state that the employee will "[r]eport to work on a regular basis as prescribed by the Employee Handbook" and that "any future violations of Company policy will result in the next level of discipline up to and including termination or directly to termination for serious violations."   (Ex. I, Ex. CC.)

Plaintiff was terminated six days later on June 26, 2008, after Burdorf returned from vacation, allegedly because Plaintiff had accumulated too many points under the Attendance Policy due to his absences. (Ex. G; Ex. C at p. 139, ll.14-24, p. 141, ll.21-25).

### B.        Procedural Background

Plaintiff filed his Original Petition on February 4, 2010 in the District Court of Nueces County, Texas. (D.E. 25, Ex. D), alleging claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq*. and the Family Medical Leave Act, 29 U.S.C. § 2601 et. seq.

---

[2] Apparently, on the 17th, Plaintiff had called Kretschmar, who told him not to come into work until the 18th.  (Ex. A at 261.)
[3] The Written Warning is dated March 30, 2008 and then crossed out and re-dated June 18, 2008.   (Ex. I; Ex. B at 70-71).

JCI removed the case to this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1441(b), and 28 U.S.C. § 1446(a) and (b).

On December 15, 2010, Defendant filed a motion for summary judgment.  (D.E. 25.) Plaintiff timely responded.  (D.E. 27.)

## III.   Discussion

### A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

Pursuant to Fed. R. Civ. P. 56(c)(1), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case." Rivera, 349 F.3d at 247. The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment"). Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party. Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

### B.    FMLA Claim

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

The FMLA makes it unlawful for an employer to interfere with, restrain, or deny an employee's FMLA rights, or to discriminate or retaliate against an employee for exercising such rights. 29 U.S.C. § 2615(a)(1), (2); Chaffin v. John H. Carter Co., 179 F.3d 316, 319 (5th Cir.1999).

"To establish a prima facie case for discrimination or retaliation under the FMLA, a plaintiff must demonstrate [1] that she is protected under the FMLA; [2] she suffered an adverse employment decision; and [3] that she was treated less favorably than an employee who had not requested leave under the FMLA or that the adverse decision was made because of her request for leave." Comeaux-Bisor v. YMCA of Greater Houston, 290 Fed. Appx. 722, 724-25 (5th Cir. 2008) (citing Bocalbos v. Nat'l Western Life Ins. Co., 162 F.3d 379, 384 (5th Cir. 1998)).

"If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to provide a legitimate nondiscriminatory or non-retaliatory reason for the termination." Id. "If the employer articulates such a reason, the plaintiff must show by a preponderance of the evidence that the employer's reason is a pretext for discrimination or retaliation." Id.

In this case, the parties dispute whether or not Plaintiff had a serious health condition entitling him to FMLA benefits. The parties also dispute whether Plaintiff satisfied his employer's request for certification from a health care provider.  Defendant also contends Plaintiff cannot establish the third element of a prima facie case: that he was treated less favorably than an employee who had not requested leave under the FMLA or that an adverse decision was made because of his request for leave.  Finally, Defendant claims it has a legitimate, nondiscriminatory reason for terminating Plaintiff: namely, Plaintiff's excessive absences from work.

### 1.    "Serious Health Condition"

The FMLA requires covered employers to provide eligible employees up to twelve weeks per year of unpaid leave when an employee has a "serious health condition" that makes the employee unable to perform the functions required by his position. See 29 U.S.C. § 2612(a)(1) &

(c); Chaffin v. John H. Carter Co., 179 F.3d 316, 319 (5th Cir.1999); Price v. Marathon Cheese Corp., 119 F.3d 330, 333 (5th Cir.1997).

The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

The Code of Federal Regulations further provides:

[s]ubstance abuse may be a serious health condition if the conditions of §§ 825.113 through 825.115, are met. However, FMLA leave may only be taken for treatment for substance abuse by a health care provider or by a provider of health care services on referral by a health care provider. **On the other hand, absence because of the employee's use of the substance, rather than for treatment, does not qualify for FMLA leave.**

19 C.F.R. § 825.119(a) (emphasis added).

One district court has noted that, pursuant to Section 825.1119, "an employee suffering from alcoholism that qualifies as a serious health condition is only entitled to FMLA leave when she is receiving treatment for her addiction, not before or after, when she is broadly suffering from her condition." Ames v. Home Depot U.S.A., Inc., 2009 U.S. Dist. LEXIS 112493, *18 (N.D. Ill. Dec. 2, 2009).

Defendant concedes that FMLA leave may be taken for substance abuse problems. However, relying on § 825.119(a), Defendant contends Plaintiff's substance abuse problem did not qualify him for FMLA leave under the C.F.R.'s standard because Plaintiff failed to show he was in treatment for all the days on which he claims he was on leave.  (D.E. 25 at 16-19.) Accordingly, says Defendant, absences were appropriately assessed against Plaintiff for days in which he was not actually under a heathcare provider for those days.  (D.E. 25, Ex. C (Burdorf depo.) at 104, 112.)

The record clearly establishes that, at certain points during his employment with JCI, Plaintiff *was* taking medical leave for the purposes of treatment of substance abuse by a health care provider, and not simply "because of [his] use of the substance," thus qualifying him for leave under Section 825.119(a).  Plaintiff was first diagnosed with alcoholism on April 2, 2008. (D.E. 25, Ex. A, at 44.)  Plaintiff's doctor at Gulfside Medical Clinic indicated that, as of June 4, 2008, Plaintiff's condition qualified as a "serious health condition" under the FMLA.  (Ex. V at JCI 725.)

Plaintiff was confirmed by JCI to have been enrolled in facilities for treatment of his alcohol dependence at three points between April 1, 2008 to June 15, 2008: April 1 to April 23 (in treatment at Watershed); April 30 to May 8 (in treatment at Watershed); and June 9 to June 15 (in treatment at Padre).  (D.E. 25 at 17.)  The periods in which Plaintiff was in treatment were considered by JCI as FMLA leave, and so no absentee points were assessed against him during these periods.  (Ex. G.)  However, points were assessed against Plaintiff for some days on which Plaintiff claims he was on approved FMLA leave – specifically, April 24, 25, 28 and 29, and May 9 through May 12 – but during which Plaintiff was not actually in treatment at Watershed. (Ex. G.)

Defendant contends these points were appropriately assessed because Plaintiff was not actually under a heathcare provider for those days.  (D.E. 25, Ex. C (Burdorf depo.) at 104, 112.)[4]  However, contrary to Defendant's assertions, the language of the Code of Regulations

---

[4] When asked about his decision to assess these points in his deposition Burdorf replied as follows:

Q: So Mr. Picarazzi was assessed two points for an absence that occurred between April 24, 2008 and April 29, 2008, when you've made representations to the EEOC that Mr. Picarazzi…was on approved leave of absence under FMLA from April 1 through May 4, 2008, correct?

A: He was on approved leave of absence.  It ended the leave of absence.  … His medical provider discharged him.
…

does not indicate that, to qualify for FMLA leave, Plaintiff must have been under the care of a physician or enrolled in a rehab institution for *each day* that he was on leave.[5]

Moreover, the Fifth Circuit has held that "an employer who without intent to deceive makes a definite but erroneous representation to his employee that she is an 'eligible employee' and entitled to leave under FMLA, and has reason to believe that the employee will rely upon it, may be estopped to assert a defense of non-coverage, if the employee reasonably relies on that

---

Q: The last sentence of [Dr. Zella's confirmation letter] says, quote "Mr. Picarazzi may return to work on May 13th, 2008." Do you see that?

A: Yes.
…

Q: …between April 30th and May 13th hr was assessed two points, wasn't he?

A: Yes.

Q: As an absence, right?

A: Yes.

Q: And why did you do that?

A: He was discharged on the 8th…He's not under a heathcare provider on the other days."

(Ex. C at 104, 112.)

[5] 29 C.F.R. § 825.113 provides that, "[f]or purposes of FMLA, 'serious health condition' entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 **or continuing treatment by a health care provider as defined in § 825.115**." §825.113(a) (emphasis added).

Section 825.115 provides that "[a] serious health condition involving continuing treatment by a health care provider" includes "[a] period of incapacity of more than three consecutive, full calendar days, **and any subsequent treatment or period of incapacity relating to the same condition, that also involves [t]reatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or [t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider**." § 825.115(a)(1)-(2) (emphasis added).

The term "incapacity" means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom.  § 825.113(b).

The term "treatment" includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. § 825.113(b).

representation and takes action thereon to her detriment."   Minard v. ITC Deltacom Communications, Inc., 447 F.3d 352, 359 (5th Cir. 2006).

The Fifth Circuit cited various cases supporting its decision to apply equitable estoppel in the FMLA context.[6]  For example, in Duty v. Norton-Alcoa Proppants, the Eighth Circuit upheld the district court's decision to equitably estop the defendant from asserting an affirmative defense that plaintiff had exhausted his twelve months of FMLA leave in July 1997.  293 F.3d at 493.  The court based its decision on the finding that defendant had sent plaintiff a letter explicitly guaranteeing FMLA leave until December 1997, and that plaintiff did or reasonably could have relied on the letter to his detriment in deciding to take leave.  Id. at 494.

In this case, the summary judgment evidence suggests that Defendant, through its employees Kretschmar, Burdorf and Tutton, made representations to Picarazzi that he was entitled to leave under FMLA and that Picarazzi did or reasonably could have relied on those representations to his detriment.  Minard, 447 F.3d at 359.

The record shows that on April 4, 2008 Leave Administrator Tuton sent Plaintiff a letter acknowledging that Human Resources was notified on March 31, 2008 of Plaintiff's need to take medical leave due to his "serious non-work related illness or injury[.]"  (Ex. K.)  Tuton stated that his leave of absence "has been approved as of April 1, 2008 and expires on May 4, 2008."  (Id.)  She further stated that his "Family Medical Leave (FMLA) runs concurrent with [his]

---

[6] The court in Minard cited the following cases: Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 724-25 (2d Cir.2001) (affirming the district court's decision to estop an employer from asserting an affirmative defense challenging an employee's FMLA eligibility when the employer's unintentional misleading behavior caused the employee to justifiably and detrimentally rely on the FMLA leave); Woodford v. Community Action of Greene County, Inc., 268 F.3d 51, 57 (2d Cir.2001) (authorizing equitable estoppel where an employer initially provided notice of eligibility for leave and later seeks to challenge it); Dormeyer v. Comerica Bank-Illinois, 223 F.3d 579, 582 (7th Cir.2000) (recognizing, in dicta, a district court's ability to equitably estop employers from asserting an affirmative defense contesting an employee's entitlement to FMLA leave in situations where the employer's words or conduct has misled the employee into relying on the leave); Duty v. Norton-Alcoa Proppants, 293 F.3d 481 (8th Cir.2002) (affirming a district court's application of equitable estoppel in an FMLA case and collecting authorities).

medical leave of absences and [his] 12-week[s] of job protection expires on June 23, 2008."
(Id.)

In his statement to the EEOC, Burdorf confirmed that JCI had approved Plaintiff's
FMLA leave for this period, stating that "[Plaintiff's] medical leave of absence under FMLA was
approved from April 1 through May 4, 2008.  Picarazzi was receiving treatment through The
Watershed as his health care provider."  (D.E. 27, Ex. B-1, at 2.)

This approved period included days on which Plaintiff was *not actually enrolled at
Watershed* and covered several days on which points were assessed against Plaintiff:
specifically, April 24, 25, 28 and 29, and May 9 through May 12.  As explained above, the
reason given was that Plaintiff was not under the care of a healthcare provider on those days.
(Ex. C at 104, 112.)  But the evidence also supports that Plaintiff was given the impression that
he was approved for FMLA leave on those days – even though he was not actually enrolled in
Watershed.

After his first stay at Watershed, Plaintiff was discharged on April 23, 2008.  He admits
that he felt ready to return to work on that day.  (Ex. A at 155).  He also stated in his complaint
that Watershed had released him to return to work on April 24.  (Ex. D.)  However, the return-to-
work date provided by his doctor to JCI was **April 30, 2008**.  (Ex. L.)  On Friday, April 25,
2008, Plaintiff sent his supervisor Kretschmar an email stating that "[e]verything is good" and
that he was working on his "12 step program every day."  He stated: "See you Wednesday.  Say
hello to everybody and tell them to watch out cause I am coming back in full force." (Ex. M).
Kretschmar testified that he "knew Plaintiff was still out for FMLA purpose[s] between April 23,
2008 and April 30, 2008."  (D.E. 27, Ex. 5 at 21-22) (Q: [Y]ou knew that Mr. Picarazzi was still
out for FMLA purposes between April 23, 2008 and April 30, 2008, correct? A: That is correct.)

In his deposition, Burdorf was asked why he assessed points against Plaintiff for days between April 23 and April 30, even though he had seen Dr. Zella's note stating Plaintiff could return to work on April 30.  Burdorf responded that he decided to assess the absences because Plaintiff was not under a healthcare provider.  (D.E. 25, Ex. C at 109.)  However, when asked whether he ever wrote, emailed or called Picarazzi to tell him that the one-week period between April 23 and April 30 would not be covered under FMLA, Burdorf admitted that he did not.  He also admitted that he was not aware of Ms. Tuton or Mr. Kretschmar notifying Plaintiff that the period from April 23 to April 30 would not be covered.  (Id. at 110.)

These circumstances suggest that Plaintiff was reasonable in assuming he was on approved leave until the 30th.  Yet Plaintiff was nonetheless assessed absence points for his absences between April 23 and April 30.

With respect to Plaintiff's second stay at Watershed, Plaintiff submitted documentation showing that he was enrolled in the program from April 30 to May 8, 2008. (Ex. N).  However, in his letter stating that Plaintiff was released on May 8, 2008, Dr. Zella stated that Plaintiff was to return to work on **May 13, 2008**.  (Id.)  Watershed scheduled an appointment for Plaintiff for outpatient therapy at Padre Behavioral Hospital ("Padre") on May 9, 2008. (Ex. N at 3.)  Although Plaintiff did not go to Padre on May 9, 2008, Plaintiff claims he instead went to Coastal Bend, a different treatment facility.  (Ex. A at p. 165, ll.8-17).  Regardless, the record does not show that anyone told Plaintiff that he had to return to work as soon as he was discharged or his time off would not qualify as FMLA leave.

When asked in his deposition why he assessed points against Plaintiff between May 8 and May 13, 2008, Burdorf again explained his reasoning that Plaintiff was not under a healthcare provider on those days.  (Ex. C at 112-113.)  Once again, Burdorf confirmed that he did not tell

Picarazzi that the time period through May 13 was being considered an absence, (Id. at 113, ll. 9-12), and did not tell Mr. Kretschmar or Ms. Tuton to inform Plaintiff that his absence through May 13 would not be counted as FMLA.  (Id. at 113, ll. 13-17.)

Subsequent interactions confirmed Plaintiff's belief that his absences were being covered as approved FMLA leave.  When Plaintiff emailed Kretschmar on May 28, 2008 asking about his status with the company, Kretschmar responded on May 29, 2008, stating: "your status with the company is you are on a medical leave of absence.  You and your medical care provider must complete the FMLA form and return it to Jan within the allotted time frame."  (D.E. 25, Ex. T.)

No mention was made of points being assessed against Plaintiff for his absences in late April or early May.  As explained above, Plaintiff was not issued his first or final warnings until June 20, 2008 – **after** he had already made the decisions not to come into work on various days for which he believed he was on approved leave.  (Ex. I, Ex. CC.)  He was terminated only 6 days later.

These circumstances indicate that an issue of fact exists as to whether Defendant made representations to Plaintiff that he was on approved FMLA leave and as to whether Plaintiff reasonably relied on such representations in believing he was entitled to be absent from work for at least some of the dates on which absences were assessed against him between April 1 and May 13, 2008.

In sum, a jury might find either that Plaintiff qualified for FMLA leave under Section 825.119(a), because he was receiving treatment for his substance abuse, or that Defendant is estopped from asserting that Plaintiff was not qualified for FMLA leave due to the representations of JCI employees that he was on approved leave and Plaintiff's reasonable reliance to his detriment on those representations.  See Minard, 447 F.3d at 359.

2.      **Medical Certification**

Defendant also contends that Plaintiff failed to provide sufficient medical documentation to show that he was receiving treatment for FMLA purposes and failed to correct the deficiency in his certification when asked.  (D.E. 25, p. at 21.)  Plaintiff asserts that he did attempt to provide sufficient medical documentation when asked and that, even if his documentation was found to be insufficient, Defendant did not give him sufficient notice or opportunity to cure the deficiency.  (D.E. 27 at 20-21.)

Pursuant to 29 C.F.R. 825.305(a), an employer may require an employee to furnish certification issued by a health care provider in order to support his request for FMLA leave, and the certification must include such information as the name, address and telephone number of the health care provider.[7]  § 825.305(a); see also § 825.306.

Section 825.305(b) provides that "[i]n most cases, the employer should request that an employee furnish certification at the time the employee gives notice of the need for leave or within five business days thereafter…The employer may request certification at some later date if the employer later has reason to question the appropriateness of the leave or its duration.  The employee must provide the requested certification to the employer within 15 calendar days after the employer's request, unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts or the employer provides more than 15 calendar days to return the requested certification."  §825.305(b); see also Urban v. Dolgencorp of Tex., Inc., 393 F.3d 572, 574 (5th Cir. 2004) ("If the employer does require   medical

---

[7] A medical certification is considered sufficient if it contains certain information, including: (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; and (4) if the leave is for the employee's own serious health condition, a statement that the employee is unable to perform the functions of his or her job. 29 U.S.C. § 2613(b).

certification, it must give the employee at least 15 calendar days in which to submit the certification.") (citing 29 C.F.R. § 825.305(b) (2002)).

The Fifth Circuit has held that the retroactive denial of FMLA status to leave already in progress may allow the employer to deem those days to be unexcused absences and accordingly discipline the worker under the employer's usual attendance policies. See Urban, 393 F.3d at 576.

However, Section 825.305(c) provides that an employee whose certification is deemed inadequate must be informed what additional information is needed to make the certification complete and sufficient, and "[t]he employer must provide the employee with **seven calendar days (unless not practicable under the particular circumstances despite the employee's diligent good faith efforts)** to cure any such deficiency." § 825.305(c) (emphasis added). Moreover, Section 825.305(d) provides that an employer must "**advise an employee of the anticipated consequences of an employee's failure to provide adequate certification**." § 825.305(d) (emphasis added); see also Urban, 393 F.3d at 574 ("If an employer requests such documentation, it is required to notify the employee of the consequences for failing to provide an adequate certification. If the employer finds the certification form incomplete, the employer must advise the employee of the deficiency and provide the employee a reasonable opportunity to cure any such deficiency.") (citing § 29 C.F.R. § 825.301(b)(1)(ii), § 825.305(d).)  If an employee then fails to correct the deficiency, the employer may deny him FMLA benefits. § 825.305(c).

The Fifth Circuit has held that an employer must comply with these cure provisions in order to retroactively deny leave based on an employee's failure to provide adequate certification.  In Lubke v. City of Arlington, the plaintiff's employer fired him for missing two days of work without providing adequate medical certification to justify his absence, and

plaintiff sued his employer under the FMLA.  455 F.3d 489, 494-94 (5th Cir. 2006).  The district court held that the employer could not rely on plaintiff's failure to provide medical certification because the employer had not complied with the provisions of § 825.305(b)-(d), stating: "[i]f an employer fails to provide notice in accordance with the provisions of this section, the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice."   Id. at 497.   On appeal, the Fifth Circuit upheld the district court's decision.  Id. at 500; see also Downey v. Strain, 510 F.3d 534, 539-540 (5th Cir. 2007)

In this case, Plaintiff contends that, as in Lubke, Defendant cannot rely on Plaintiff's failure to provide medical certifications because Defendant did not comply with the regulations, requiring an employer who requests certification to give an employee reasonable opportunity to cure.  (D.E. 27 at 20-21.)  The Court agrees.

With regard to Plaintiff's first request for FMLA leave, the record shows that JCI did not object to the medical certifications Plaintiff submitted to document his first request for FMLA leave at Watershed.  Rather, Watershed submitted Plaintiff's Request for Leave of Absence form with medical certifications, which JCI received around March 31, 2008.  (Ex. J.)  On April 4, 2008, JCI acknowledged Plaintiff's notice of need for leave commencing April 1 and continuing to approximately May 4, 2008, supported at the time by appropriate medical documentation, stating that Plaintiff's leave had been approved for this period.  Plaintiff was instructed to update Human Resources of his status every 30 days.  (Ex. K).[8]

---

[8] To the extent Defendant argues that Plaintiff has not offered documentary evidence to support that he was under treatment qualifying him for FMLA leave in the days between his discharges on April 23 and May 8, respectively, and his returns to work, on April 30 and May 13, respectively, these arguments do not support an argument based on request for medical certification because the record indicates that JCI did not specifically request medical certification to support those absences.  Rather, as discussed above, Plaintiff was not informed that these days were being counted as absences.  Under Section 825.305(a), an employer making a request for medical certification "must give notice of a requirement for certification each time a certification is required; such notice must be written notice whenever required by § 825.300(c).  An employer's oral request to an employee to furnish any subsequent certification is sufficient."  § 825.305(a).

JCI did request additional medical certification from Plaintiff regarding his second May 24, 2008 request for FMLA leave.  On May 21, 2008 Tuton informed Plaintiff that he was to complete a "Request for Leave of Absence" form and that failure to return the paperwork within 15 days could result in his being denied his twelve weeks of leave under the FMLA.  (D.E. 25, Ex. Q.)  On June 10, 2008, Burdorf sent Plaintiff a letter regarding his May 24, 2008 request for leave, stating that Plaintiff was to submit the attached form by June 17, 2008, and that failure to timely provide the information would result in the denial of FMLA benefits during his absence. (Ex. Y.)

This evidence shows that, by granting Plaintiff seven days to turn in Attachment A, JCI attempted to comply with the requirement of section 825.305(c).  See § 825.305(c) (employer must give employee whose certification is deemed inadequate seven days to correct the deficiency in medical certification, unless not practicable despite employee's good faith, diligent efforts.)  However, there is a dispute as to when precisely Plaintiff received "Attachment A." Plaintiff contends he did not receive it with Burdorf's June 10, 2008 letter, though did receive it later on.  (D.E. 25, Ex. A at 219-221.)

Moreover, the record shows Plaintiff and his medical providers were attempting to comply with the request for certification in a timely manner.  On June 13, 2008, Dr. Giavanonne faxed the "Attachment A" form to Burdorf, confirming that Giavanonne examined Plaintiff on June 4, 2008. (Ex. AA).  Also, the evidence shows that Laura Morales at Padre Behavior was attempting to meet the June 17, 2008 deadline for return of paperwork, but was "confused about what needs to be done and who needs to fill it out."  (Ex.. W.)  On June 18, 2008 – only one day after Burdorf's deadline – Padre sent Tuton documentation of Plaintiff's treatment at Padre

commencing June 9. (Ex. BB).  The "Certification of Healthcare Provider" form confirmed that Plaintiff was under treatment at Padre between June 9 and June 15. (Ex. A at p. 215, ll.3-9).

Thus, there is a genuine issue of material fact as to whether Plaintiff received sufficient opportunity to correct the deficiency in his certification, or whether he was unable to comply despite his good faith efforts.  § 825.305(c).

In any case, even if it is ultimately found that Plaintiff did not comply with the requirement to furnish certification following Burdorf's request, the record suggests that Plaintiff was not appropriately informed of the consequences of his failure to comply.  In late May 2008, Plaintiff's supervisors began discussing the points accumulating against Plaintiff under the Attendance Policy.  (D.E. 27, Ex. 1 (Kretschmar depo.) at 66-68) ("We [Burdorf and I] started discussing [that Picarazzi was accumulating points] around May, the May time period, around May 20th, 21st.")  However, apparently, no one at JCI informed Plaintiff that attendance points were being accumulated against him at this time.  (Id. at 74) (Q: [I]n none of these emails [between Kretschmar and Picarazzi] did you ever mention that he was going to be written up for points for absences being assessed against him? A: That is correct.)  Rather, as explained, Plaintiff was not issued warnings under the Attendance Policy until June 20, 2008.  (Ex. I, Ex. CC.)  This evidence suggests that, when Plaintiff was attempting to meet JCI's request to furnish medical certification, he was not aware that his failure to do so would mean a discharge from JCI due to an accumulation of absence points.

Accordingly, the Court finds Defendant is not entitled to summary judgment on the issue of medical certifications.  Plaintiff has raised genuine issues of material fact as to: whether Plaintiff complied with Defendant's requests for medical certifications prior to his being fired on June 26, 2008; whether Plaintiff was given sufficient opportunity to correct the deficiency in his

medical certifications; and whether Plaintiff was adequately informed of the consequences of his failure to comply.

### 3.    Connection Between FMLA Leave And Termination

Defendant claims Plaintiff cannot demonstrate the third element of a FMLA retaliation claim: that he was treated less favorably than an employee who had not requested leave under the FMLA or that he was terminated because of his request for leave.  Comeaux-Bisor, 290 Fed. Appx. at 724-25.  Defendant points out that Plaintiff's supervisors tried to help him get his absences approved as FMLA leave and gave Plaintiff many opportunities to supplement his allegedly insufficient documentation.  Defendant argues this belies any inference that the termination decision was made because Plaintiff exercised his FMLA rights.  (D.E. 25 at 23-24.)

In evaluating the issue of whether the termination was a result of Plaintiff's FMLA leave, the Court considers the "temporal proximity" between Plaintiff's FMLA leave and the termination.  Mauder v. Metro. Transit Auth. of Harris County, Texas, 446 F.3d 574, 583 (5th Cir. 2006).  "The Fifth Circuit has stated that 'a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes,' which is sufficient 'to satisfy the . . . prima facie case.'"  Villalon v. Del Mar College Dist., 2010 U.S. Dist. LEXIS 82766, * 17 (S.D. Tex. Aug. 13, 2010) (quoting Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001)).

Here, Plaintiff was terminated on June 26, 2008, a little over a week after his FMLA leave ended upon release from Padre.  Moreover, as discussed above, there remain genuine issues of material fact regarding whether JCI assessed absences against Plaintiff for days that he was on approved FMLA leave.  Based on this evidence, Plaintiff has succeeded in surviving

summary judgment on the issue of whether he was terminated due to his request for FMLA or his decision to take FMLA.

### 4.    Legitimate Nondiscriminatory Reasons For Termination

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to provide a legitimate nondiscriminatory or non-retaliatory reason for the termination. If the employer articulates such a reason, the plaintiff must show by a preponderance of the evidence that the employer's reason is a pretext for discrimination or retaliation. Bocalbos, 162 F.3d at 384.

Defendant contends that, even if Plaintiff has made a prima facie case for retaliation, Defendant has articulated a legitimate non-discriminatory reason for his termination: accumulation of absence points under the JCI Attendance Policy. (D.E. 25 at 24.)  Plaintiff contends, however, that the point assessment was retroactively created and not consistently executed by Plaintiff's supervisors. (D.E. 27 at 1-2.)  Rather, the true reason was retaliation for Plaintiff's taking FMLA leave.

As discussed above, Plaintiff has succeeded in raising a genuine issue of material fact as to whether JCI assessed points against Plaintiff for days on which he was on approved FMLA leave.  If so, this would contradict Defendant's assertion that JCI simply neutrally applied the Attendance Policy to Plaintiff's situation without interfering with or retaliating because of Plaintiff's FMLA leave.  If Plaintiff was actually on approved FMLA leave on some of those days, then it is not clear JCI would have had sufficient grounds to fire him. See Munoz v. Echosphere, L.L.C., 2010 U.S. Dist. LEXIS 71913, * 28 (W.D. Tex. July 15, 2010) ("[Defendant] has provided no evidence that its attendance policies and internal procedures would actually justify the firing; it has thus not adequately set forth a legitimate,

nondiscriminatory reason"); see also Johnson v. SBC Advanced Solutions, Inc., 2004 WL 1151650, *8 (N.D. Tex. May 21, 2004) (finding that defendant's excuse that plaintiff's firing was due to unsatisfactory attendance was not sufficient to warrant summary judgment because it was not clear plaintiff would still have been fired if he had not taken FMLA leave.) Compare Bell v. Dallas County, 2010 WL 1141390, *3 (N.D. Tex. 2010) (finding defendant's excuse for discharging plaintiff – excessive absences – was sufficient when defendant's termination letter demonstrated that the termination was not based on any absences where FMLA leave was applied.)

   In addition, the Fifth Circuit has applied the mixed-motive framework in FMLA retaliatory discharge cases.[9]  Based on this legal standard, even if Plaintiff's absences really did comprise one reason Defendant fire Plaintiff, Plaintiff has succeeded in raising an issue of fact as to whether retaliation for his taking FMLA leave was also a factor.  Richardson., 434 F.3d at 333.  For instance, even if Defendant rightly assessed some absences against Plaintiff for days when he was not in treatment and had no other excuse, Plaintiff's decision to take FMLA leave on days for which he was duly covered may also have been a factor in the decision to fire Plaintiff.

   To summarize, the Court finds that there is sufficient evidence in the record to establish a prima facie case: (1) there is a genuine issue of material fact regarding whether Plaintiff was protected under the FMLA during some of the days on which he was absent, or whether Defendant is equitably estopped from asserting non-coverage; (2) Plaintiff was terminated; and

---

[9] Within the mixed-motive framework, (1) the employee must make a prima facie case of discrimination; (2) the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action; and (3) the employee must offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or-and herein lies the modifying distinction-(b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination.  Richardson v. Monitronics Intern., Inc., 434 F.3d 327, 333 (5th Cir. 2005).

(3) there is a genuine issue of material fact regarding whether Plaintiff was terminated because of his request for FMLA leave or that his termination occurred because he took FMLA leave. The Court further finds that JCI has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, that is, unsatisfactory attendance. However, Plaintiff has succeeded in raising a genuine issue of material fact regarding whether retaliation was actually the sole motive, or a motive, in JCI's decision to fire Plaintiff.

### C.     ADA Claim

The ADA generally prohibits employers from discriminating or retaliating against an employee with a qualifying disability. 42 U.S. See 42 U.S.C. § 12112(a)(2000).[10]

### 1.     Whether Plaintiff Is Disabled Under the ADA

The parties initially dispute whether Plaintiff, a diagnosed alcoholic, has a "disability" qualifying him for protection under the ADA.

The threshold showing Plaintiff must make is that he suffered from a disability protected under the ADA. Rogers v. International Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir.1996). The ADA defines disability as follows: "(1) a mental or physical impairment that substantially limits one or more major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such an impairment." See 42 U.S.C. § 12102(2) (2000). Under EEOC regulations, a "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 29 C.F.R. § 1630.2(g).

Major life activities include such tasks as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." § 1630.2(i)).

---

[10] Congress recently enacted the ADA Amendments Act of 2008, PUB. L. NO. 110-325, 122 STAT. 3553 (2008), but these changes did not take effect until January 1, 2009 and do not apply retroactively. EEOC v. Agro Distrib. LLC, 555 F.3d 462, 469, n. 8 (5th Cir. 2009).

"Substantially limits" means a person is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." § 1630.2(j)(1)(ii).

"The Fifth Circuit and other courts have declined to find alcoholism to be a *per se* disability under the ADA." Lottinger v. Shell Oil Co., 143 F. Supp. 2d 743, 761 (S.D. Tex. 2001) (citing Burch v. Coca-Cola Co., 119 F.3d 305, 313 (5th Cir. 1997); Nelson v. Williams Field Servs. Co., 216 F.3d 1088, 2000 WL 743684, at *4 (10th Cir. 2000); McKey v. Occidental Chem. Corp., 956 F. Supp. 1313, 1317 (S.D. Tex. 1997)). Instead, "the question of disability, or no disability, based on alcoholism, must be made on a case-by-case basis." Nelson, 2000 WL 743684, at *4.

In this case, Plaintiff has succeeded in raising genuine issues of material fact as to whether he was substantially limited in performing one or more daily life activities, or whether he was regarded as having such impairment. See 42 U.S.C. § 12102(2). An employee is "regarded as" having a substantially limiting impairment if he: (1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others towards such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment. See Bridges v. Bossier, 92 F.3d 329, 333 (5th Cir. 1996); see also Tabatchnik, 262 Fed. Appx. at 675 ("Pursuant to Equal Employment Opportunity Commission regulations, a person is regarded as having an impairment if he '[h]as none of the impairments . . . but is treated by a covered entity as having a substantially limiting impairment.'") (quoting 29 C.F.R. § 1630.2(l)).

Defendant points out that in his deposition Plaintiff stated that, at the time when he was discharged by JCI on June 26, 2008, he was physically able to work, could take care of himself, get dressed, exercise, and did not generally suffer physical limitations on his ability to do anything.  (D.E. 25 at 12-13.)   However, Plaintiff indicated in his deposition that when he "relapsed on alcohol" he did have physical limitations in his ability to take care of himself and that during the period in which he was drinking he was unable to work.[11]  In addition, according to the medical certification form submitted with Plaintiff's May 24, 2008 Request for Leave of Absence, the doctor who examined Plaintiff at Gulfside Medical Clinic concluded that Plaintiff would not be able to work due to his condition.  (Ex. V at JCI 725).

With regard to consideration of "working" as one of the major life activities, "working" "does not necessarily mean working at a particular job of one's choice."   Bridges v. City of Bossier, 92 F.3d 329, 335 (5th Cir. 1996); see also 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to

---

[11] Plaintiff stated in his deposition as follows:

Q: And there were no physical restrictions on you at the time that you were terminated?
A: No.
Q: And were you able at that point in time to take care of yourself…get yourself up in the morning?
A: Yes.
Q: Get dressed and go to work?
A: That's correct.
Q: …engage in exercise or recreation…no physical issues?
A: Yes.
Q: And at the time that you were discharged, was there any physical limitations on your abilities to do anything?
A: No.
Q: And since being let go in June 26 of 2008, have you have any physical limitations on your ability to work?
A: No.
Q: Have you had any physical limitations on your ability to work, do things around the houses?
A: No.
**Q: Any physical limitations on your ability to take care or yourself?**
**A: No. Only just when I relapsed on alcohol because that's a recovering process.**
**Q: And even when you relapsed on alcohol you were still able to take care of yourself, correct?**
**A: Oh, yes.**
**Q: It was just that period while you were drinking that you were unable to work?**
**A: Correct.**
Q: And there was nothing about your alcoholism that prevented you from applying and pursuing a wide variety of jobs, correct?
A: Correct.

(Ex. A, at 259-260) (emphasis added).

perform a single, particular job does not constitute a substantial limitation in the major life activity of working.")  However, Plaintiff's deposition testimony, as well as Gulfside's medical assessment, indicate that he may have been substantially impaired in his ability to work in many, if not all, occupations.  Also, Plaintiff indicated that, at least while he was drinking, he was unable to take care of himself.  (Ex. A at 260.)

Moreover, the summary judgment evidence suggests that Plaintiff's employer, JCI, treated Plaintiff as having a substantially limiting impairment, which would also qualify Plaintiff as "disabled" under the ADA.  See Tabatchnik, 262 Fed. Appx. at 675.  For example, when Picarazzi returned to work on May 13, 2008 after his stay at Watershed, JCI had him sign a Return to Work Agreement, affirming that he agreed to adhere to JCI attendance policies.  (Ex. O.)[12]  Burdorf was asked in his deposition what the JCI practice was regarding asking employees to execute such agreements.  Burdorf stated:

> if somebody has a medical condition of this nature of alcohol, they come and ask for help, we give them the guidance, point them in the right direction, but they have to sign a return to work agreement because we want them to be clean going forward.  We want them to follow the recommendations.

(Ex. C at 119.)  These comments suggest that, whether or not he had a substantially limiting impairment, Plaintiff may have been treated by his employer as having a substantially limiting impairment.  Tabatchnik, 262 Fed. Appx. at 675

---

[12] Plaintiff's RTW Agreement provided, in pertinent part:

> I understand that this Agreement does not affect my ongoing obligation to adhere at all times to John Crane practices and policies, including policies regarding attendance (absenteeism) and tardiness, and that I am subject to discipline up to and including immediate discharge in the event I violate John Crane policy.
> I UNDERSTAND AND AGREE THAT MY CONTINUED EMPLOYMENT IS CONTINGENT UPON MY MEETING SATISFACTORILY ALL OF THE ABOVE TERMS AND THAT MY FAILURE TO DO SO SUBJECTS ME TO IMMEDIATE TERMINATION.  I HAVE READ THIS AGREEMENT AND ENTER INTO IT FREELY AND VOLUNTARILY.

(Ex. O.)

In sum, based on the evidence on record, Plaintiff has succeeded in raising a genuine issue of material fact as to whether he had a "disability" under the ADA, either because he had a mental or physical impairment that substantially limited one or more major life activities, or because he was regarded by JCI as having such an impairment.  See 42 U.S.C. § 12102(2).

### 2.    Prima Facie Case

To demonstrate unlawful retaliation under the ADA, Plaintiff must make a prima facie case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action. Seaman v. CSPH, 179 F.3d 297, 301 (5th Cir. 1999).

"It is undisputed that making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity." Tabatchnik, 262 Fed. Appx. at 676; see also Stoddard v. Geren, 2010 U.S. Dist. LEXIS 18755, 2010 WL 774156, at *21 (S.D. Tex. Mar. 3, 2010) ("Requesting an accommodation, even if it is later determined that the employee making the request is not disabled, is a protected activity so long as the employee had a good faith belief that he was covered by the ADA.").

This Court has previously held that for purposes of the first element of the prima facie case of an ADA claim, a plaintiff's request for medical leave under the ADA can constitute a request for a "reasonable accommodation" under the ADA.  See Villalon v. Del Mar College Dist., 2010 WL 3221789, * 7 (S.D.Tex., Aug. 13, 2010) (citing cases.)  Accordingly, Plaintiff has established that, in requesting FMLA leave, he was engaged in a "protected activity" under the ADA.

 Plaintiff has also clearly established the second element of the prima facie case: an "adverse employment action," as he was terminated on June 26, 2008, under two weeks after

returning from a medical leave of absence which he believed was protected and approved by JCI under the FMLA.  As to the second element, the summary judgment evidence – including the temporal proximity between Plaintiff's leave and his termination, as well as the factual dispute regarding the integrity of JCI's assessments of his absences under the Attendance Policy – indicates that there remains a genuine issue of material fact as to the true reason Defendant chose to terminate Plaintiff.  Given these circumstances, Plaintiff has met his burden on summary judgment to put forth evidence suggesting a causal connection between the protected act (taking FMLA leave) and his termination. Seaman, 179 F.3d at 301.

### 3.      Legitimate Nondiscriminatory Reason

If the plaintiff establishes a prima facie case under the ADA, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action. Seaman, 179 F.3d at 301. If such a reason is provided, the plaintiff must submit sufficient evidence that the proffered reason is a pretext for retaliation.  Id. The employee must show that but for the protected activity, the adverse employment action would not have occurred. Id.  In an ADA retaliation claim, ultimately "the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred."  Id.

Here, although Defendant has articulated a legitimate, nondiscriminatory reason for firing Plaintiff – namely, insufficient attendance – Plaintiff has succeeded in raising a genuine issue of material fact as to whether this was merely pretext for a discriminatory motive, given that Defendant may have assessed absences against Plaintiff on days he was on approved FMLA leave.  Plaintiff has met his burden to put forth evidence suggesting that his termination would not have occurred if he had not requested and taken FMLA leave.

IV.    **Conclusion**

For the reasons stated above, the Court DENIES Defendant's Motion for Summary Judgment.  (D.E. 25.)

SIGNED and ORDERED this 7th day of February, 2011.

_____
Janis Graham Jack
United States District Judge